## JAMES SEMPLE and W. W. McQueen v. R. T. BURKE.

### (144 N. W. 103.)

**Partners — cash sales — collections — accounting.**

The defendant, with a partner named Allert, owned and operated a drug store for some ten years, at the end of which time said Allert sold his interest to the two plaintiffs, who were practising physicians. Defendant continued to have entire charge of the business, and at the end of twenty-six months, upon application of plaintiffs, the business was sold by a receiver. Defendant kept a cash book in which each day he entered the cash under the heading "Cash sales," "Collections," or "Cash sales and collections." He also kept other books in which were entered credit sales. Plaintiffs contend that the total amount of cash received by the defendant exceeds by some $4,000.65 the amount of cash disbursed by him. Defendant explains that he entered some of the collections as cash sales, and that in this way he is charged by the plaintiffs with said sums twice. Evidence is examined, and *held* for reasons fully set out in the opinion, that this explanation is not in accordance with the fact, and that the defendant is liable for the difference in cash as found by the trial court.

Opinion filed November 18, 1913.

Appeal from the District Court of Cavalier County, *Kneeshaw,* J. Affirmed.

*Murphy & Duggan,* for appellant.

*Joseph Cleary* and *Gray & Myers* for respondents.

BURKE, J. The defendant, with a partner named Allert, owned and operated a drug store at Langdon, North Dakota, from about 1894 up to the year 1904, at which time the plaintiffs, who are practising physicians, purchased the interest of said Allert. Thereafter, for a period of twenty-six months, the business was conducted under a partnership arrangement whereby the defendant owned a one-half interest therein, and the plaintiffs each a one-fourth interest. During the said time the defendant was in sole charge of the business, doing all of the purchasing, paying bills, and hiring help. For these services he was to receive from the firm the sum of $75 per month. The plaintiffs had no voice in the affairs of said business. The defendant kept the books of the firm, a cash book, a blotter, collection register, bills receivable, and other books. He testifies that he kept a cash register through which all items of cash received, including collections, were passed; that each night he took the cash from the register and placed it in the safe until morning, at which time it was counted and an entry made in the cash book of the amount found. He further testifies that whenever a collection was made, that the money was taken to the cash register and placed therein, and that the only way that the total amount of cash sales could be ascertained was by subtracting the total amount received upon collections, as shown by his collection register, from the total items of cash sales, as shown by the cash book.

After the business had been run the said period of twenty-six months, the plaintiffs became dissatisfied with the conduct thereof and began this action for a receivership and an accounting between the parties. An expert accountant named Higgins was hired by the plaintiffs to make an examination of the books of the firm and ascertain the condition of the business. This accountant prepared a very thorough and painstaking statement showing among other things the amount of cash received into said business from all sources whatever and the amount of cash expended for all purposes. As a result of this

calculation he found that the cash received exceeded the cash disbursed by some $4,000.65. In arriving at the sum total of the cash received, Higgins charged defendant with the amount of cash on hand at the commencement of business, which was $75, with $1,000 contributed by the partners during the course of the business, with moneys received from cash sales $23,550.77, with cash received from collections $4,041 and $1,137, with an overdraft at the bank of $383.81, and money borrowed of the bank $500. The books of the partnership were introduced in evidence and are before us. The expert Higgins was upon the stand and his testimony, covering some 200 pages of the abstract, is also before us for examination, as well as the testimony of the parties to the suit. All of this has been carefully read and reread in an effort to find corroboration of the theories of the different parties to this suit. We cannot, however, set out this testimony, or even any considerable part thereof, in this opinion, but will confine ourselves to an analysis of the principal point of dispute in the case. It will be noticed that the expert Higgins has charged the defendant with cash sales amounting to $23,550.77, and also with cash collected from bills receivable of $4,041 and $1,137. The defendant, on the other hand, claims that all collections were put through the cash register and then through the cash book, and that thus the cash sales taken by Higgins at $23,550.77 are in truth $4,041 too high, and that this accounts for the $4,000.65 shortage with which he is charged. Thus, we have the dispute of the parties reduced to a single issue, namely, were the cash sales of the goods over the counter $23,550.77, or were they $19,509.88? That this is the gist of the controversy appears from the original brief of the appellants, wherein they say: "He (Higgins) charged defendant for cash sales of merchandise all cash taken in as shown by the cash book, except where the entry showed that the cash was on account of collections; defendant explains that all cash taken in, whether on account of cash sales or collections, was put through the cash register without making any segregation or record of the amount of each item. At the end of the day's business, the cash was counted and entered in the cash book generally, without showing anything on account of collections. Defendant contends that the alleged shortage as claimed and figured out by the expert arises because of the fact that he is in many instances charged twice on account of collections. *This is really the only point of conflict in this lawsuit.*"

The defendant when on the stand made the following answers to questions:

Q. Then the difference between yourself, Mr. Burke, and Mr. Higgins as shown by his account, is the difference of $4,000.65, is it not?

A. Why, I guess that is the case, all right.

Q. Now, then, Mr. Burke, assuming that Mr. Higgins in this account, or to arrive at this result, has charged you with the collections to the amount of $5,178, and assuming also that the total amount of the debit side of the cash book, with the exception that he deducted $1,137 from the total of his collections,—now the amount of the deduction by reason of the total inclusion of the items of collections would be the amount of $5,100 less the $1,100, would it not?

A. I believe so.

Q. Now the $5,100 of collections less the $1,137 leaves how much?

A. $4,041.35.

Q. Now the amount is to a very close degree of approximation the amount which his statement of account shows due from you?

A. I believe so.

Q. So that outside of this matter of cash through the collections and daily sales, you and Mr. Higgins practically agree on the account?

A. I believe that is right.

As we have before stated, this lawsuit depends entirely upon whether or not we accept the defendant's explanation of his entries of cash sales. If we take his statement as true, it wipes out the balance against him shown by the books, and the judgment of the lower court must be reversed; on the other hand, if we hold defendant to the entries which he has made under the designation of cash sales, a simple calculation shows that he has failed to account for a large sum of money. The plaintiffs have accepted this challenge, and in a lengthy brief have pointed out their reasons for disbelieving the defendant. Among the strongest of those reasons is that upon many of the days where the collections are claimed by defendant to have been included in the item of cash sales, the collections made were larger than the said cash item. For example, upon June 2d, 1904, the cash book shows cash sales amounting to $10.80, and the collection register for that day shows a collection of $12.28. Evidently the collection made that day was not

included in the item of cash sales entered by the defendant. The defendant, however, in his brief, calls attention to the fact that this particular collection was a check received from a neighboring town, and that said check was not deposited in the Langdon bank for collection until June 10th. It is defendant's idea evidently that this check was not put through the cash register upon the day that it was entered in the collection register, but that it was probably run through the cash register upon some other day. Upon the whole, it appears to us that this instance shows that collections were not run through the cash register at the time of their receipt at least, and probably not at all. Again, on July 13, 1904, collections amounted to $17.95, and cash sales to $20.70. Defendant says that this item was a check which was also deposited at a later date. Also, on October 3, 1904, the collections entered in the collection register amounted to $67.15, whereas the cash sales of that date are only $35.40. The explanations made by the defendant in his brief do not clear up entirely this discrepancy. There are many other days pointed out by the plaintiffs wherein the collections exceeded the cash sales, or came so near to equaling them that the inference is strong that the collections upon those days were not run through the cash register at all. Upon the whole we think that those items are a strong corroboration of plaintiffs' theory of the case, and that they have not been satisfactorily explained by the defendant. As a second reason for disbelieving the defendant, plaintiffs point out that the total amount with which they had charged the defendant upon collections in dispute was $4,041, and that $1,500 of this was collected otherwise than in cash, and that it could not therefore have been included by the defendant in his cash sales. In this list they have included $1,029.15 worth of goods which were sold to the defendant himself and paid by him in salary, and $107 which were offset against the salary of other employees. There are also items of ice and board and other incidentals in the same category. It is pointed out by the plaintiffs that this $1,563.10 is part of the $4,041 which the defendant claims was charged against him both as collections and cash.

In addition to those reasons, it might be pointed out that the defendant was a man of considerable experience, having run this business for more than twelve years and having a partner all the time. During this time he kept the books, and it is very improbable that he would

have no independent method of showing the cash sales. To enter "collections" as "cash sales" is such an unusual procedure that it throws suspicion upon the defendant's statement. Again we find from an examination of the testimony that the business was apparently prosperous. The store seemed full of customers, and the margin of profits on the sales was satisfactory to the defendant. The store was well organized. The partnership owned their own real estate and the expenses were moderate. The invoices show that something over $20,000 worth of goods were purchased during the twenty-six months, and that the stock retained its value. It is thus apparent that goods costing $20,000 were sold over the counter, and presumably at customary drug store profits. Both of the plaintiffs are practising physicians enjoying a large practice, and they naturally threw most of their prescription work to the store. The defendant testified that the line of goods that he sold usually sold at a good profit, and among other things said "whisky is a pretty good line;" while the presence in the invoice sheet of certain well-known names, and the expense item of a government license to sell intoxicating liquors, are both suggestive of profits. It would seem that total cash sales and collections would exceed $23,550.77, especially when but $2,336.32 was uncollected on the books. Again, taking the matter of the monthly reports made by the defendant to his partners. These specifically stated the amount of the "cash sales" per month, which amounted in all to $23,818.24. This statement also contained the amount of credit sales, which amounted to $7,232.64, which showed a sum total of sales of $31,050.88. It is undisputed that at the close of the business there were outstanding but $2,336.32 in accounts receivable, which seems to indicate that defendant had received in cash at least $28,714.56, from which there should be subtracted all collections known to be made in cash, or about $5,000 according to defendant's statements. This would still indicate cash sales of over $23,000 as against $16,000 now claimed by the defendant. Again, the expert Higgins, when upon the stand, pointed out many instances in which it was doubtful whether certain cash received sprung from cash sales or from collections, and that he had in all instances gone through the books to ascertain the true source of the money; that in most instances a reference to the books disclosed positively the character of the funds, and he was able to place the item in the proper column, and that in the few

instances where doubt still remained he gave the benefit of the doubt to the defendant. Those instances are set forth in full in the record, and while too lengthy to be reproduced here, are very convincing in their nature. Without going further into the evidence, which is a matter of importance only in this one case, we content ourselves with saying that we adopt the figures found by the trial court, and such judgment is in all things affirmed.